# United States Court of Appeals
## For the First Circuit

No. 06-1861

UNITED STATES OF AMERICA,

Appellant,

v.

LEO WEIKERT,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Lipez, Circuit Judge, and
Gibson[*] and Stahl, Senior Circuit Judges.

Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellant.
Terence P. Noonan, with whom Noonan & Noonan was on brief, for appellee.

August 9, 2007

---

[*] Of the Eighth Circuit, sitting by designation.

**LIPEZ, Circuit Judge.**  This case presents a question of first impression in this circuit: is it a violation of the Fourth Amendment's prohibition on unreasonable searches and seizures to require an individual on supervised release to provide a blood sample for purposes of creating a DNA profile and entering it into a centralized database?  Agreeing with the eleven other circuits that have held similarly, we hold that it is not.  In doing so, we interpret the Supreme Court's decision in Samson v. California, 126 S. Ct. 2193 (2006), to require that we join the majority of the circuits in applying a "totality of the circumstances" approach to the issues in this case, rather than the "special needs" analysis used by the minority of circuits.

However, we also impose an important limitation on our holding.  Because the appellant is currently on supervised release and will remain so until 2009, we do not resolve the question of whether it is also constitutional to retain the DNA profile in the database after he is no longer on supervised release.  Mindful of the well-established principle that constitutional cases should be decided as narrowly as possible and the rapid pace of technological development in the area of DNA analysis, we reserve judgment on that issue for another day.

**I.**

**A. Statutory Background**

Pursuant to the DNA Analysis Backlog Elimination Act of

2000 ("DNA Act"), Pub. L. No. 106-546 (codified as amended in scattered sections of 10 U.S.C., 18 U.S.C., and 42 U.S.C.), individuals who have been convicted of a "qualifying federal offense" and who are incarcerated or on parole, probation, or supervised release must provide federal law enforcement authorities with "a tissue, fluid, or other bodily sample" for purposes of extracting their DNA. 42 U.S.C. §§ 14135a(a)(1)-(2), (c)(1).[1]

The DNA Act specifies that the government may "use or authorize the use of such means as are reasonably necessary" to collect a DNA sample. Id. at § 14135a(a)(4)(A). Before the district court a United States Probation Officer explained that in Weikert's case a blood sample would be obtained by means of a painless fingerprick. Refusal to comply with the DNA collection procedure is a misdemeanor punishable by up to one year's imprisonment and a fine of $100,000. 42 U.S.C. § 14135a(a)(5); 18 U.S.C. §§ 3571, 3581. Moreover, courts are required to order compliance with the DNA Act "as an explicit condition of supervised release." 18 U.S.C. § 3583(d). Thus, failure to provide a DNA sample in compliance with the DNA Act both violates the obligation not to commit any additional offenses while on supervised release and violates an express condition of the release. See 18 U.S.C.

[1] Under 42 U.S.C. § 14135a(d), the term "qualifying federal offense" includes any felony, any offense under 18 U.S.C. § 109A, any "crime of violence" as defined in 18 U.S.C. § 16, and any attempt or conspiracy to commit such an offense.

§ 3583(d).

The FBI uses the DNA sample to create a genetic profile of the individual based on information contained at thirteen specified locations in the person's DNA. See Nat'l Comm'n on the Future of DNA Evidence, Nat'l Inst. of Justice, U.S. Dep't of Justice, The Future of Forensic DNA Testing 19 (2000), available at http://www.ncjrs.gov/pdffiles1/nij/183697.pdf (hereinafter "The Future of Forensic DNA Testing"). Profiling is performed using only so-called "junk DNA" — DNA that differs from one individual to the next and thus can be used for purposes of identification but which was "purposely selected because [it is] not associated with any known physical or medical characteristics" and "do[es] not control or influence the expression of any trait." H.R. Rep. No. 106-900(I), at 27 (2000), 2000 WL 1420163 (letter of Robert Raben, Assistant Attorney General, to The Honorable Henry J. Hyde, Chairman, House Judiciary Committee).[2] Thus, the profiles contain only "an agency identifier for the agencies submitting the DNA profile; the specimen identification number; the DNA profile; and the name of the DNA personnel associated with the DNA analysis." Id. In effect, the system "provide[s] a kind of genetic fingerprint, which uniquely identifies an individual, but does not

---

[2] A report prepared by the National Institute of Justice explains that ninety-seven percent of DNA "has no known function" and notes, parenthetically, that "[o]ne reason for [the choice to perform DNA analysis on such junk DNA] has been to protect individual privacy." The Future of Forensic DNA Testing 12.

provide a basis for determining or inferring anything else about the person."  Id.

The profile is then entered into the FBI's Combined DNA Index System ("CODIS"), a massive, centrally managed database including DNA profiles from federal, state, and territorial DNA collection programs, as well as profiles drawn from crime-scene evidence, unidentified remains, and genetic samples voluntarily provided by relatives of missing persons.  As of April 2007, CODIS contained more than four million profiles of individual offenders and over 175,000 profiles derived from crime scene evidence and other sources.  See Federal Bureau of Investigation, National DNA Index System Statistics, available at http://www.fbi.gov/hq/lab/codis/clickmap.htm (last visited July 11, 2007).

CODIS is a valuable law enforcement tool.  It may be used to match evidence found at one crime scene with evidence found at another crime scene, revealing a common perpetrator.  It also may be used to match evidence from the scene of a crime to a particular offender's profile.  These attributes allow the FBI to investigate crimes more efficiently and more accurately, both by identifying offenders and by eliminating innocent suspects.  The FBI credits CODIS with aiding more than 49,466 investigations nationally.  See Federal Bureau of Investigations, Investigations Aided, http://www.fbi.gov/hq/lab/codis/aidedmap.htm     (hereinafter

-5-

"Investigations Aided") (last visited July 11, 2007).

The DNA Act contains an array of statutory safeguards to foreclose the possibility of abuse. CODIS information generally may be used only "[by] criminal justice agencies for law enforcement identification purposes[,] . . . in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules[, and] for criminal defense purposes, [by] a defendant." 42 U.S.C. § 14132(b)(3). The DNA Act also provides for a fine of up to $250,000 or a year in prison for the unauthorized disclosure or use of a DNA sample or result. Id. § 14135e(c).

## B. Factual and Procedural Background

In 1990, appellant Leo Weikert pled guilty in the Western District of Texas to one count of conspiracy to possess cocaine with the intent to distribute and was sentenced to a term of 120 months. He escaped from prison in 1994, and was apprehended in Massachusetts in 1999. He then pled guilty in the District of Massachusetts to one count of escape from custody, and, in January 2000, was sentenced to eight months of imprisonment, to be served consecutively with his previous term. He also was sentenced to twenty-four months of supervised release to follow his incarceration.[3]

_____

[3] Weikert will remain on supervised release until 2009 because he was sentenced to five years of supervised release for his previous conviction in Texas and is serving the two terms of

-6-

Weikert was released from prison on December 10, 2004. The Probation Office notified him of its intent to take a blood sample in order to collect his DNA, and Weikert subsequently filed a motion for a preliminary injunction and requested a hearing. The government opposed the motion and filed a request to revoke Weikert's supervised release.

The district court granted the preliminary injunction. The court explained that, in analyzing the constitutionality of the DNA Act, the other circuits have split over whether to apply the general Fourth Amendment totality of the circumstances test or the special needs exception. It then held that the special needs exception was the appropriate test because "the special needs doctrine has evolved to be the proper form of analysis for searches without individualized suspicion." It explained that the special needs test first asks whether the statute serves a special need distinct from traditional law enforcement, and, if so, whether the government's need outweighs the intrusion on the individual's privacy interest. Applying that analysis, the court concluded that no special need existed because "[t]he government's immediate purpose in collecting DNA samples is to solve crimes," which was not beyond the normal need for law enforcement.

Acknowledging that its conclusion that no special need existed was sufficient to find the search unreasonable under the

supervised release concurrently.

-7-

Fourth Amendment, the court nevertheless continued with its analysis. Even if such a special need existed, the court held, the individual's privacy interests would outweigh the government's interest in obtaining the information. The court found the government's interest in creating and using the database to solve crimes "substantial, given the success the government has had in using DNA samples to assist in investigations." However, this substantial interest was outweighed by "the intrusion into an individual's personal identity through the analysis of the blood . . . not to mention the danger of a later publicizing of the information gleaned from the sample."

Finally, the district court found that the other preliminary injunction factors — the possibility of irreparable injury, the balance of harms, and the public interest — weighed in Weikert's favor. Thus, the court granted the injunction. The government now appeals from that decision.

**II.**

Under 28 U.S.C. § 1292(a)(1), we have jurisdiction to hear an interlocutory appeal of an order granting a preliminary injunction. In considering a motion for a preliminary injunction, a district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying

an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest. Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004). The first inquiry is the most important element of the preliminary injunction assessment: "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

On appeal, we review the grant or denial of a preliminary injunction for abuse of discretion. Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005). Within that framework, however, "findings of fact are reviewed for clear error and issues of law are reviewed de novo." Id. Here, the facts are undisputed, and the only legal question is whether the collection of Weikert's DNA under the DNA Act violates his rights under the Fourth Amendment. We subject that issue to de novo review, see United States v. Sargent, 319 F.3d 4, 8 (1st Cir. 2003); our disposition of the issue will determine Weikert's likelihood of success on the merits.

## A. Individualized Suspicion and Conditional Release

The Fourth Amendment guarantees that the people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Unquestionably, the extraction of blood for DNA profiling

constitutes a search within the meaning of the Fourth Amendment. See Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989)("We have long recognized that a compelled intrusion into the body for blood to be analyzed for alcohol content must be deemed a Fourth Amendment search." (internal quotation marks, alteration, and citation omitted)); see also Winston v. Lee, 470 U.S. 753, 760 (1985); Schmerber v. California, 384 U.S. 757, 767-68 (1966).

The fact that a search occurred, however, is not dispositive of the Fourth Amendment inquiry. Rather, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977)(quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)). Establishing that a search is reasonable ordinarily requires that the government demonstrate probable cause to a neutral magistrate and obtain a particularized warrant authorizing the search. United States v. United States Dist. Ct., 407 U.S. 297, 315-16 (1972). However, the Court has authorized certain exceptions to these requirements, including, relevant to our purposes, in "those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." New Jersey v. TLO, 469 U.S. 325, 351 (1985)(Blackmun, J., concurring).

The so-called "special needs" doctrine has been used to analyze searches in a variety of contexts where the government has neither obtained a warrant nor established individualized suspicion. See, e.g., Illinois v. Lidster, 540 U.S. 419, 423-28 (2004) (upholding a highway checkpoint designed to enable police to question citizens about a recent crime); Bd. of Educ. v. Earls, 536 U.S. 822, 828-30 (2002) (upholding a program that required all students participating in extracurricular activities to submit to random, suspicionless drug testing); Ferguson v. City of Charleston, 532 U.S. 67, 77-84 (2001) (holding unconstitutional a public hospital's non-consensual drug testing of maternity patients); City of Indianapolis v. Edmond, 531 U.S. 32, 41-47 (2000)(invalidating a roadside checkpoint designed to detect illegal drugs); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 660-65 (1995)(upholding a program subjecting student athletes to random, suspicionless drug testing).  In determining whether a suspicionless search qualifies for the "special needs" exception, a critical issue is whether the search is designed to further ordinary law enforcement objectives.  The Court has invalidated programs "whose primary purpose was to detect evidence of ordinary criminal wrongdoing," explaining that this type of "general interest in crime control" could not qualify as a special need. Edmond, 531 U.S. at 41-42 (citation and internal quotation marks omitted); see also Ferguson, 532 U.S. at 83 (holding the program

invalid because the "immediate objective of the searches was to generate evidence for law enforcement purposes").

The Court previously has applied the "special needs" doctrine in evaluating the constitutionality of a law targeted at individuals on conditional release.[4] In Griffin v. Wisconsin, 483 U.S. 868, 873 (1987), the Court upheld a Wisconsin law permitting any probation officer to search a probationer's home without a warrant so long as there were "reasonable grounds" to support a search. The Court explained that "the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable grounds.'" Id. at 876. Requiring probation officials to obtain a warrant would "set[] up a magistrate rather than the probation officer as the judge of how close a supervision the

_____

[4] Probation, supervised release, and parole are all different forms of conditional release from prison. Probation is an alternative sanction to imprisonment in which a court permits a convicted offender to serve his or her sentence in the community subject to certain conditions and supervision by a probation officer. 18 U.S.C. §§ 3561, 3563. Supervised release, by contrast, is a period of community supervision imposed by the court to be completed after release from a jail or prison sentence, 18 U.S.C. § 3583(a); it may be subject to the same conditions as probation, see id. § 3583(d), and also involves supervision by a probation officer, see id. § 3583(f). Parole is similar to supervised release in that it consists of a period of community supervision to follow a prison term; however, after the Sentencing Reform Act of 1984, Pub. L. No. 98-473 (codified as amended at 18 U.S.C. §§ 3551-3742), parole is no longer a valid status for new federal offenders. See, e.g., Johnson v. United States, 529 U.S. 694, 696-97 (2000)(recognizing abolition of most forms of parole and the creation of supervised release).

-12-

probationer requires," delay probation officials' response to evidence of misconduct, and reduce the deterrent caused by the possibility of prompt searches. Id. Likewise, compliance with the probable cause requirement "would reduce the deterrent effect of the supervisory arrangement," id. at 878, and would prevent the probation office being able to "intervene before a probationer does damage to himself or society," id. at 879. Given the state's interest in assuring "that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large," id. at 875, the Court found the Wisconsin law constitutional.

Subsequently, however, in United States v. Knights, 534 U.S. 112 (2001), the Court did not apply the special needs doctrine in upholding a warrantless search of a probationer that was supported by reasonable suspicion. Rather, the Court held that the search was reasonable "under [the] general Fourth Amendment approach of 'examining the totality of the circumstances.'" Id. at 118 (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)). In explaining its decision, the Court noted that the probationer had signed a probation order agreeing to submit to a search of his person and property by a law enforcement officer "at any[ ]time, with or without a search warrant, warrant of arrest or reasonable cause." Id. at 114. Thus, the probationer's status informed both sides of the Fourth Amendment reasonableness balance. Probationers

inherently have a decreased expectation of privacy, and the agreement to the search condition further decreased that expectation. Id. at 119-20. The government also has a greater interest in preventing recidivism, and is "quite justified" in concluding that a probationer "will be more likely to engage in criminal conduct than an ordinary member of the community." Id. at 121. The Court concluded that "the balance of these considerations requires no more than reasonable suspicion," ultimately holding that "the warrantless search . . . , supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." Id. at 121-22.

Most recently, in Samson v. California, 126 S. Ct. 2193, 2197 (2006), the Court applied a totality of the circumstances analysis in upholding a suspicionless search of a parolee conducted pursuant to a California law stating that, as a condition for release, every prisoner eligible for state parole must agree to be subject to a search or seizure by a parole officer with or without a search warrant and with or without cause.[5] After reiterating Knights's holding that "probationers 'do not enjoy the absolute liberty to which every citizen is entitled,'" id. (quoting Knights, 534 U.S. at 119), the Court explained that, "[e]xamining the

_____

[5] Samson was decided subsequent to the district court's decision in this case.

totality of the circumstances pertaining to petitioner's status as a parolee, . . . including the plain terms of the parole search condition, . . . petitioner did not have an expectation of privacy that society would recognize as legitimate," id. at 2199 (citations omitted). The Court also deemed the state's interests "substantial," citing the need to reduce recidivism and promote reintegration among those on conditional release. Id. at 2200. Given the number of parolees and the high likelihood of recidivism, "a requirement that searches be based on individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders." Id. at 2200-01. Thus, the Court concluded, "a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." Id. 2196.

## B. Application to the DNA Act

The other circuits have split in the analysis they apply to the federal DNA Act or its state law analogs. A majority — the Third, Fourth, Fifth, Eighth, Ninth, Eleventh, and D.C. Circuits — use the totality of the circumstances analysis described in Knights and Samson. See United States v. Kraklio, 451 F.3d 922, 924 (8th Cir. 2006)(federal DNA Act); Johnson v. Quander, 440 F.3d 489, 496 (D.C. Cir. 2006)(federal DNA Act); United States v. Sczubelek, 402

F.3d 175, 184 (3d Cir. 2005)(federal DNA Act); <u>Padgett</u> v. <u>Donald</u>, 401 F.3d 1273, 1280 (11th Cir. 2005)(Georgia analog); <u>United States</u> v. <u>Kincade</u>, 379 F.3d 813, 832 (9th Cir. 2004)(en banc)(federal DNA Act); <u>Groceman</u> v. <u>U.S. Dep't of Justice</u>, 354 F.3d 411, 413-14 (5th Cir. 2004)(per curiam)(federal DNA Act); <u>Jones</u> v. <u>Murray</u>, 962 F.2d 302, 306-07 (4th Cir. 1992)(Virginia analog).  A minority — the Second, Seventh, and Tenth Circuits — apply the special needs analysis.  <u>See</u> <u>Amerson</u>, 483 F.3d 73, 79 n.6 (2d Cir. 2007)(federal DNA Act); <u>United States</u> v. <u>Hook</u>, 471 F.3d 766, 773 (7th Cir. 2006)(federal DNA Act); <u>United States</u> v. <u>Kimler</u>, 335 F.3d 1132, 1146 (10th Cir. 2003)(federal DNA Act).  Finally, the Sixth Circuit, in <u>United States</u> v. <u>Conley</u>, 453 F.3d 674, 679-81 (6th Cir. 2006), declined to choose a mode of analysis, holding that the DNA Act was constitutional under either a totality of the circumstances or a special needs analysis.[6]

Much of this authority preceded the Supreme Court's decision in Samson, which now offers additional guidance.  Prior to Samson, the Court had never held that the totality of the circumstances was the appropriate test to apply in a suspicionless search of a conditional releasee.  Thus, several courts had

_____

[6]    The circuits also disagree over which test is more rigorous.  <u>Compare</u> <u>Sczubelek</u>, 402 F.3d at 184 (explaining that it would apply the "more rigorous <u>Knights</u> totality of the circumstances test rather than the <u>Griffin</u> special needs exception) and <u>Kraklio</u>, 451 F.3d at 924 (same) <u>with</u> <u>Amerson</u>, 483 F.3d at 79 n.6 (2d Cir. 2001)(indicating that the special needs test is more "stringent").

concluded that a suspicionless search could not be justified absent a special need (or some other exception).  See, e.g., Nicholas v. Goord, 430 F.3d 652, 666 (2d Cir. 2005)("The Supreme Court has never applied a general balancing test to a suspicionless-search regime.").  However, Samson now indicates that the totality of the circumstances analysis is, in fact, the appropriate framework to apply in a situation involving even a suspicionless search of a conditional releasee.  Samson, 126 S. Ct. at 2202; see also id. at 2204 (Stevens, J., dissenting)(explaining that "the Court for the first time upholds an entirely suspicionless search unsupported by any special need").  In so holding, the Court explained that "[t]he touchstone of the Fourth Amendment is reasonableness, not individualized suspicion," and noted that the "'Fourth Amendment imposes no irreducible requirement of such suspicion,'" 126 S. Ct. at 2201 n.4 (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976)).  It concluded:

> [A]lthough this Court has only sanctioned suspicionless searches in limited circumstances, namely programmatic[7] and special needs searches, we have never held that these are the only limited circumstances in which searches absent individualized suspicion could be "reasonable" under the Fourth Amendment. In light of California's earnest concerns respecting recidivism, public safety, and

---

[7] The Supreme Court has not provided a precise definition of a "programmatic" search.  However, it has listed as examples of such searches "checkpoints to combat drunk driving or drug trafficking."  Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006).

> reintegration of parolees into productive society, and because the object of the Fourth Amendment is <u>reasonableness</u>, our decision today is far from remarkable.

<u>Id.</u> (footnote added).  <u>Samson</u> thus indicates that a search of an individual on conditional release is properly subject to the totality of the circumstances analysis rather than the special needs analysis, notwithstanding the lack of individualized suspicion.

The Court's application, in Samson, of the totality of the circumstances analysis also may reflect its recognition that the search in that case could not qualify as a "special needs" search.  Special needs involve those "beyond the normal need for law enforcement," Griffin, 483 U.S. at 873, and the search in Samson — that of a suspected parole violator's person by a law enforcement officer, Samson, 126 S. Ct. at 2196 — is difficult to characterize as anything other than an ordinary law enforcement search for weapons or contraband.  A similar problem arises in attempting to apply the special needs test to the DNA Act.  The CODIS mission statement explicitly states that it is an "effective tool for solving violent crimes" and that it was formed in 1990 "for law enforcement purposes."  See Federal Bureau of Investigation, CODIS Mission Statement & Background, available at http://www.fbi.gov/hq/lab/codis/program.htm (last visited July 11, 2007).  Moreover, the legislative history reveals a multitude of references to the goal of solving crimes.  See United States v.

-18-

Kincade, 379 F.3d 813, 856 (9th Cir. 2004)(Reinhardt, J., dissenting)(collecting citations to the legislative history). Although the government's brief emphasizes certain arguably non-law-enforcement-related purposes of the DNA Act, such as obtaining reliable proof of a felon's identity and preventing recidivism, it is clear that law enforcement objectives predominate. Thus, the centrality of law enforcement objectives to the DNA Act buttresses our conclusion that the totality of the circumstances analysis, rather than the special needs analysis, is appropriate.[8]

Despite Samson's focus on reasonableness and the totality of the circumstances, two circuits subsequently have applied the special needs analysis to the DNA Act. In Hook, the Seventh Circuit made no reference to Samson and followed, without

---

[8] We understand the dissent's desire to read Samson as narrowly as possible, and thereby preserve the special needs analysis for a case such as this. If that could be done, the regime established by the DNA Act, with its law enforcement objectives, probably could not meet the special needs standard. Respectfully, however, we believe that Samson can only be read to eliminate the special needs analysis in a case involving the suspicionless search of a suspect on supervised release. The fact that a central purpose of the DNA Act is to solve crimes does not distinguish it from the program at issue in Samson — as noted, the search in that case was a classic law enforcement search designed to uncover evidence of weapons or contraband. The fact that the program at issue in Samson is in part designed to "reintegrat[e] [] parolees into productive society," Samson, 126 S. Ct. at 2201 n.4, does not distinguish it from the regime established by the DNA Act, which also has reintegration as one of its goals. Relatedly, the fact that Samson involved a state program does not meaningfully differentiate it from the federal program at issue here. Given that the programs are similar in all relevant ways, we believe that we are required to use here the totality of the circumstances analysis employed by the Court in Samson.

discussion, its prior decision in Green v. Berge, 354 F.3d 675 (7th Cir. 2004), in which it applied the special needs analysis. 471 F.3d at 772. Then, in Amerson, the Second Circuit concluded that Samson did not affect its prior decision in United States v. Lifshitz, 369 F.3d 173, 180-81 (2d Cir. 2004), in which it applied the special needs test to probationers challenging New York's DNA indexing statute. 483 F.3d at 79. In light of its circuit precedent, the court concluded that the special needs test should apply "[b]ecause the Supreme Court has not, to date, held that the expectations of privacy of probationers are sufficiently diminished to permit probationer suspicionless searches to be tested by a general balancing test."

Notwithstanding Amerson's holding, we conclude that there is no rationale for differentiating supervised release from other conditional release statuses for purposes of determining whether to apply the totality of the circumstances analysis or the special needs analysis. The grounds cited by the Supreme Court in its decision to apply a totality of the circumstances analysis in Samson — the state's broad concerns regarding "recidivism, public safety, and reintegration," Samson, 126 S. Ct. at 2201 n.4 — apply similarly to parolees and supervised releasees. Moreover, in general the circuits "have not distinguished between parolees, probationers, and supervised releasees for Fourth Amendment purposes." Kincade, 379 F.3d at 817 n.2 (collecting cases); see

-20-

also <u>Sczubelek</u>, 402 F.3d at 179 (explaining that, "[e]ven though this is the first opportunity we have had to address this issue in the context of an individual on supervised release, we have addressed similar challenges in the context of parole and probation," and following those previous rulings).[9]  Finally, as we have explained, law enforcement objectives are central to the DNA Act, and thus the analysis applicable to special needs "beyond the normal need for law enforcement," <u>Griffin</u>, 483 U.S. at 873, is inapplicable here.  Consequently, we hold that the analysis used for parolees in <u>Samson</u> is appropriately applied to the supervised release situation present here.  <u>See</u> <u>Kraklio</u>, 451 F.3d at 924 (applying the totality of the circumstances analysis to a probationer's challenge to the DNA Act after <u>Samson</u>).

**C. Balancing of Interests**

Having determined that we apply the general Fourth Amendment totality of the circumstances analysis to Weikert's challenge to the DNA Act, we now weigh his expectation of privacy against the government's interests in conducting the search.

1. Privacy Interests

---

[9] In <u>Samson</u>, the Court suggested a distinction between parole and probation, noting that "parolees have fewer expectations of privacy than probationers,"  126 S. Ct. at 2198, but did not indicate whether it would have used a different analysis if the defendant had not been a parolee.  Importantly, however, supervised release is more closely akin to parole than to probation, <u>see</u> <u>infra</u> note 4, and thus any distinction the Court might have drawn between parole and probation would not differentiate parole from supervised release.

As our discussion thus far has shown, individuals on conditional release have a substantially diminished expectation of privacy. See, e.g., Knights, 534 U.S. at 119 ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." (internal quotation marks and citations omitted)). Indeed, in Samson, the Court concluded that "[e]xamining the totality of the circumstances pertaining to petitioner's status as a parolee, . . . including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate." 126 S. Ct. at 2199.

Weikert contends that his status as a supervised releasee distinguishes him from the parolee in Samson, affording him a greater degree of privacy. He claims that "[r]evocation of parole or probation may cause reinstatement of the remainder of a sentence" while "[r]evocation of supervised release . . . cannot reinstate the sentence as it is already completed and punishment is statutorily capped at five years for even the most heinous violators." He adds that "[t]his codifying of limited revocation punishments demonstrates a far greater expectation of privacy . . . for supervised releasees like Weikert."

Weikert's description of the differences among parole, probation, and supervised release is not entirely accurate. Supervised release replaced parole within the federal system as a

result of the Sentencing Reform Act of 1984, see Johnson v. United States, 529 U.S. 694, 696-97 (2000), and both of these forms of conditional release follow, rather than replace, a term of imprisonment, see id. at 697. More importantly, however, as we have already explained, courts generally have not distinguished among conditional releasees for Fourth Amendment purposes, and we do not find the differences material here. See supra page 20. To the extent that different statuses may diminish an individual's expectation of privacy to different degrees, the distinction is probably unfavorable to Weikert. At least one court has found that supervised release places "'[t]he most severe'" limits on expectations of privacy, greater than those of both parole and probation. United States v. Balon, 384 F.3d 38, 44 (2d Cir. 2004)(quoting United States v. Lifshitz, 369 F.3d 173, 181 n.4 (2d Cir. 2004)). Thus, as previously noted, Weikert has a substantially diminished expectation of privacy, and we accord his privacy interest less weight in our balancing of the relevant interests.

In addition to Weikert's status as a supervised releasee, we must also consider the nature of the search in evaluating his privacy interests. The Court has held that "the intrusion occasioned by a blood test is not significant, since such 'tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood

-23-

extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.'" Skinner, 489 U.S. at 625 (quoting Schmerber, 489 U.S. at 771). Weikert emphasizes, and we agree, that an internal search such as a blood draw is inherently more intrusive than a purely external search such as fingerprinting or photographing. See Sczubelek, 402 F.3d at 197 n.14 (McKee, J., dissenting)("[T]he extraction of blood involves some risk, including infection and transmission of disease. Although this may be viewed as 'minimal,' the risk present for any given extraction is certainly greater than zero."); cf. Bell v. Wolfish, 441 U.S. 520, 558 & n.39 (1979)(holding that a body cavity search was constitutional, while noting that "the inmate is not touched by security personnel at any time during the visual search procedure"). However, in light of the Court's clear statement in Skinner, the blood draw is neither a significant nor an unusual intrusion.

Importantly, Weikert's privacy is implicated not only by the blood draw, but also by the creation of his DNA profile and the entry of the profile into CODIS. Weikert insists that this additional step raises unique privacy considerations. He explains that, unlike fingerprints, which yield only information about one's identity, DNA "could offer up information about his daughter, his parents, his other family members . . . . There could be information about diseases, environmental predispositions, or

-24-

recessive traits — all private health information that ought not to be forcibly taken and maintained by the government." Weikert's argument essentially reduces to two possibilities. First, the government might disregard its current stated procedure of using only the specified section of junk DNA to create an identifying profile, and might instead examine other sections of his DNA to extract personal information. Second, scientific advances might make it possible to deduce information beyond identity from the junk DNA the government has obtained under the DNA Act.

With respect to the first scenario, we recognize the risk that such an abuse may occur. However, such a possibility can be accorded only limited weight in a balancing analysis that focuses on present circumstances. Moreover, the DNA Act offers a substantial deterrent to such hypothetical abuse by imposing a criminal penalty for misuse of DNA samples. It states that "[a] person who knowingly discloses a sample or result . . . in any manner to any person not authorized to receive it, or obtains or uses, without authorization, such sample or result" is subject to up to a $250,000 fine or one year in prison. 42 U.S.C. § 14135e(c). Hence, the potential for unauthorized access to personal information, in violation of the explicit terms of the DNA

Act, does not significantly increase Weikert's privacy interest in the present case.[10]

The second scenario is not unforeseeable. Although the DNA collection as currently implemented involves only junk DNA that is not associated with any known physical or mental characteristics, "new discoveries are being made by the day that challenge the core assumption underlying junk DNA's name — regions of DNA previously thought to be 'junk DNA' may be genic after all." Kincade, 379 F.3d at 850 (Reinhardt, J., dissenting). Therefore, we agree that, "[s]hould the uses to which 'junk DNA' can be put be shown in the future to be significantly greater than the record before us today suggests, a reconsideration of the reasonableness balance struck would be necessary." Amerson, 483 F.3d at 85 n.13. However, on the record before us, the possibility that junk DNA may not be junk DNA some day also does not significantly augment Weikert's privacy interest in the present case.

2. Government Interests

---

[10] The government has stated repeatedly that it uses only junk DNA in creating individual DNA profiles. However, we note that the exclusive use of junk DNA is mandated by neither the DNA Act itself nor by regulations the Attorney General is authorized to implement under the Act. See 42 U.S.C. § 14135a(e)(1). Indeed, the DNA Act includes a broad authorization, id. § 14135a(a)(1)(A) & (B), to perform "analysis of the deoxyribonucleic acid (DNA) identification information in a bodily sample," id. § 14135a(c)(2). None of our sister circuits has noted this omission. For purposes of this appeal, we take the government at its word, but emphasize that evidence that the DNA analysis procedure has been changed to include non-junk DNA — either officially or unofficially — would require a reconsideration of our Fourth Amendment analysis.

-26-

In response to Weikert's assertions of privacy, the government advances several interests served by collecting Weikert's DNA and entering his profile into CODIS. First, it cites the need to identify, monitor, and rehabilitate individuals on supervised release. The Court has "repeatedly acknowledged" the importance of government "interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees," and, by extension, supervised releasees. Samson, 126 S. Ct. at 2200. The government has an "overwhelming interest" in maintaining a record of the identities of such individuals because they "are more likely to commit future criminal offenses than are average citizens"; indeed, the interest in combating recidivism is the "very premise behind the system of close parole supervision." Penn. Bd. of Probation & Parole v. Scott, 524 U.S. 357, 365 (1998). Relatedly, the collection of DNA "indirectly promote[s] the rehabilitation of criminal offenders by deterring them from committing crimes in the future." Sczubelek, 402 F.3d at 186; see also Kincade, 379 F.3d at 838-39.

The government also explains that the inclusion of DNA profiles in the database enhances its ability to solve crimes efficiently and accurately. As other circuits have noted:

> The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or

> left at the scene of a crime . . . . The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods."

Amerson, 483 F.3d at 87; see also Jones v. Murray, 962 F.2d 302, 307 (4th Cir. 1992). Importantly, CODIS also has the capacity to exonerate those wrongly suspected of criminal activity. The DNA Act protects "innocent individuals — whose DNA does not match the DNA collected at the crime scene — from even becoming potential suspects." Amerson, 483 F.3d at 88; see also Kincade, 379 F.3d at 839 n.38 ("[U]se of CODIS promptly clears thousands of potential suspects — thereby . . . 'advancing the overwhelming public interest in prosecuting crimes accurately.'" (quoting Rise v. Oregon, 59 F.3d 1556, 1561 (9th Cir. 1995)). And, as discussed, the fact that CODIS has aided over 50,000 investigations around the country provides empirical evidence of its effectiveness. See Investigations Aided.

Finally, we note that the DNA Act includes no discretionary component. Courts have acknowledged that the presence of such discretion affects the balancing of interests because it risks "dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society." Samson, 126 S. Ct. at 2202; see also Sczubelek, 402 F.3d at 187. Here, there is no possibility of such abuse: the DNA Act

states that the probation office "shall collect a DNA sample from each . . . individual [on probation, parole, or supervised release] who is, or has been, convicted of a qualifying federal offense." 42 U.S.C. § 14135a(a)(2).[11]  In short, the importance of the government's interests is not diluted by the possibility of selective enforcement or harassment.

### 3. Balancing of Interests

After careful consideration, we conclude that the government's important interests in monitoring and rehabilitating supervised releasees, solving crimes, and exonerating innocent individuals outweigh Weikert's privacy interests, given his status as a supervised releasee, the relatively minimal inconvenience occasioned by a blood draw, and the coding of genetic information that, by statute, may be used only for purposes of identification. We emphasize that other factors, such as demonstrated misuse of the DNA samples, a change in the government's collection procedures to include non-junk DNA, or the discovery of new uses for "junk DNA," would require a reevaluation of the reasonableness balance.  See Amerson 483 F.3d at 87 ("[W]e underscore that were we faced with evidence of misuse of the DNA samples or scientific advances concerning the information that can be mined from the DNA footprint stored on the CODIS database, our analysis and ultimate conclusions

---

[11] As noted, qualifying federal offenses include all felonies, as well as various other offenses, and conspiracy or attempt to commit those offenses.  See supra note 1.

-29-

might very well be different." (citations omitted)); Jones, 440 F.3d at 499 ("[F]uture technological advances in DNA testing (coupled with possible expansions of the DNA Act's scope) may empower the government to conduct wide-ranging 'DNA dragnets' that raise justifiable citations to George Orwell."). After consideration of the totality of the circumstances present here, however, we conclude that neither the blood draw nor the subsequent creation of a DNA profile and the entry of that profile into CODIS constitutes an unreasonable search or seizure in violation of the Fourth Amendment.[12]

## D. Limitations

We emphasize another important limitation on our holding. This case presents a challenge to the practice of collecting and analyzing the DNA of an individual currently on supervised release. Thus, we express no opinion on the constitutionality of the retention and searching by the government of the DNA profiles of individuals who have completed their terms of conditional release, which is its standard practice.

---

[12] We respect the dissent's concerns about the long term implications of our decision here. That perspective is important. Every doctrine can be applied to future cases in ways that may or may not be desirable. At the same time, a concern for potential future applications cannot justify a result at odds with the circumstances of the case before us. Nevertheless, mindful of the potential implications of our decision, we have chosen to craft a narrow decision that recognizes the result required in this case while preserving the possibility of different outcomes in future cases.

On this point, we find persuasive Judge Gould's concurrence in the judgment in the Ninth Circuit's decision in Kincade, which was necessary to form a majority to uphold the constitutionality of the DNA Act. Judge Gould emphasized that the majority opinion expressed no view on the question "whether DNA samples, though lawfully obtained from a felon on supervised release, may properly be retained by the government after the felon has finished his or her term and has paid his or her debt to society." 379 F.3d at 842 (Gould, J., concurring). He explained that, "[a]lthough it might seem counter-intuitive to law enforcement that a record once gleaned might be lost, there is a substantial privacy interest at stake." Id. at 841-42. Thus, "[i]n a proper case where this issue is presented, we would presumably need to weigh society's benefit from retention of the DNA records of a felon against that person's right, in a classical sense, to privacy." Id. at 842.

Other authorities also have suggested that the balancing of the relevant interests would change after an individual completes the term of conditional release. In Green v. Berge, 354 F.3d 675 (7th Cir. 2004), Judge Easterbrook explained in concurrence that "[c]ourts that have dealt with constitutional challenges to DNA-collection statutes frequently have lumped together all persons subject to these laws," but that in fact "there are at least four major categories, each subject to

-31-

different legal analysis." Id. at 679 (Easterbrook, J., concurring)(emphasis added). He explained that these categories consist of "prisoners," "persons on conditional release," "felons whose terms have expired," and "[t]hose who have never been convicted of a felony." Id. at 679-80. Although Judge Easterbrook then suggested that the inclusion of former conditional releasees' DNA profiles in CODIS might be justified, explaining that "[e]stablished criminality may be the basis of legal obligations that differ from those of the general population," id. at 680, the distinction he draws between current and former conditional releasees strongly suggests that the constitutionality of the DNA Act should be analyzed separately with respect to each group.

Similarly, in Kincade, the dissenting judges indicated their agreement with Judge Gould's point that the privacy interests at stake are different once a conditional releasee has completed his term. See Kincade, 379 F.3d at 870 (Reinhardt, J., dissenting)(referring to the defendant's "full future expectation of privacy"); id. at 871-72 (Kozinski, J., dissenting)(emphasizing that "[o]nce Kincade completes his period of supervised release, he becomes an ordinary citizen just like everyone else. Having paid his debt to society, he recovers his full Fourth Amendment rights, and police have no greater authority to invade his private sphere than anyone else's"); id. at 875 (Hawkins, J., dissenting)(agreeing that "Judge Gould properly questions whether it is reasonable to

retain the sample beyond the period of supervised release — in perpetuity, according to this record," but concluding that the instant case did not present that issue).

This authority alone suggests the wisdom of withholding judgment on whether retaining a former conditional releasee's DNA profile in CODIS passes constitutional muster.  The distinction in status between a current and a former offender clearly translates to a change in the privacy interests at stake.  A former conditional releasee's increased expectation of privacy warrants a separate balancing of that privacy interest against the government's interest in retaining his profile in CODIS.

There are other considerations as well that support this separate balancing.  The ongoing evolution in our understanding of DNA warrants particular caution in determining what is constitutionally permissible.  DNA profiles possess unique properties that distinguish them from other records.  The samples from which those profiles are created have the potential to reveal information about an individual's health, propensity for certain diseases, and, perhaps, sexual orientation and propensity for certain conduct.  Kincade, 379 F.3d at 842 n.3 (Gould, J., concurring); id. at 850 (Reinhardt, J., dissenting).  Moreover, DNA contains information relating to hereditary characteristics, and thus the collection of such information also may reveal information about profiled individuals' family members.  As we have explained,

the technology surrounding DNA analysis is changing rapidly, and we think it more prudent to decide whether the DNA profile may be retained in CODIS following a term of conditional release in light of the state of technology when that issue is brought before us.

Finally, we note that the group of offenders whose profiles are entered into CODIS — all felons, plus individuals who have committed a variety of other crimes — is heterogenous. The justification for retaining the DNA of one type of offender beyond the term of conditional release might be more powerful than the justification for retaining the DNA of a different type of offender, and we do not wish to make a blanket determination on the undeveloped record now before us.

We acknowledge that fingerprints and other personal records "are routinely maintained in law enforcement files once taken." Kincade, 379 F.3d at 842 n.3 (Gould, J., concurring). However, it may be time to reexamine the proposition that an individual no longer has any expectation of privacy in information seized by the government so long as the government has obtained that information lawfully.[13] Specifically with reference to DNA

---

[13] We recognize that no circuit has held that the DNA record must be expunged. The D.C. Circuit, in Johnson, explicitly held that no Fourth Amendment violation results from retaining the DNA in the database after the individual in question is no longer on conditional release. 440 F.3d at 498. The court explained that "accessing the records stored in the CODIS database is not a 'search' for Fourth Amendment purposes," because "the process of matching one piece of personal information against government records does not implicate the Fourth Amendment." Id. It then

profiling, scholars have argued that "individuals do not lose their privacy interest in [] information merely because the government first obtained [that information] for a valid purpose. Rather, courts should confront the question of whether the prospective law enforcement use . . . satisfies the reasonableness requirement of the Fourth Amendment." Harold J. Krent, Of Diaries and Data Banks: Use Restrictions Under the Fourth Amendment, 74 Tex. L. Rev. 49, 94 (1995); see also Jason Tarricone, Note, "An Ordinary Citizen Just Like Everyone Else": The Indefinite Retention of Offenders' DNA, 2 Stan. J. Civ. Rts. & Civ. Liberties 209, 249-50 (2005)(concluding that the DNA profile, but not the tissue sample from which it was created, should be retained after a term of conditional release). The argument for a continued expectation of privacy despite the legality of an initial search is particularly deserving of separate consideration given the wealth of information that DNA has the potential to reveal, as well as the fact that science is continually uncovering new information that is contained in our DNA. We are hesitant to say that an individual has no continued

_____

analogized CODIS to police files containing snapshots and fingerprint databases, concluding that if such material "is taken in conformance with the Fourth Amendment, the government's storage and use of it does not give rise to an independent Fourth Amendment claim." Id. at 499. Likewise, in Amerson, the Second Circuit indicated that retention of the DNA profile in CODIS does not "change[] the ultimate analysis" because "we have upheld, in the past, the retention and use of information properly collected under the Fourth Amendment, if there was a strong enough public interest in retaining it, when there no longer was a diminished expectation of privacy." 483 F.3d 86.

expectation of privacy in a DNA profile when our understanding of the information that such a profile contains is necessarily incomplete. Cf. Florida v. Riley, 488 U.S. 445, 454-55 (1989)(O'Connor, J., concurring)(indicating that reasonable expectations of privacy may change over time depending on what "'society is prepared to recognize as "reasonable"'" (quoting Katz v. United States, 389 U.S. 347, 361 (1967))). In short, there may be a persuasive argument on different facts that an individual retains an expectation of privacy in the future uses of her DNA profile. That possibility, and the other interests we have identified above, persuade us that it is wise to reserve judgment on the constitutional issues implicated by the retention of the DNA profile after the period of supervised release has been completed.

Our decision to limit our holding accords with the general practice of deciding constitutional cases narrowly. See United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 478 (1995)(noting "[o]ur policy of avoiding unnecessary adjudication of constitutional issues"); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936)("The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" (quoting Liverpool, N.Y. & Phil. Steamship Co. v. Emigration Comm'rs, 113 U.S. 33, 39 (1885))); Yazoo & Miss. Valley R.R. v. Jackson Vinegar Co., 226 U.S. 217, 219-20 (1912)("[T]his court must deal with the case in hand, and

not with imaginary ones.  It suffices, therefore, to hold that, as applied to cases like the present, the statute is valid."); see also Kincade, 379 F.3d at 840 n.2 (Gould, J., concurring).  We see no reason to depart from that practice here.  Thus, we save for another day our consideration of the Fourth Amendment interests at stake in retaining an individual's DNA in the database after he completes his term of supervised release.

## III.

After careful consideration, we conclude that the collection and analysis of Weikert's DNA under the DNA Act does not violate the Fourth Amendment.  Consequently, Weikert is unlikely to succeed on the merits of his claim.  This merits issue is by far the most important consideration in deciding whether a preliminary injunction was improvidently granted.  See New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  We thus reverse the decision of the district court granting a preliminary injunction and remand for further proceedings.  Each party shall bear its own costs.

**So ordered.**

**STAHL, Senior Circuit Judge, dissenting.** I write briefly to dissent from the majority's able opinion. I believe there are important distinctions between Samson v. California, 126 S. Ct. 2193 (2006), and the case before us, and would therefore employ the special needs test and conclude that the suspicionless search mandated by the DNA Act is an unconstitutional violation of the Fourth Amendment. Where a right as central to our liberty as the freedom from unreasonable searches and seizures is at stake, I am unwilling to go further in restricting that right than the Supreme Court has explicitly required.

The majority is correct that Samson moved one step beyond United States v. Knights, 534 U.S. 112 (2001), by using the totality of the circumstances test to approve a suspicionless search of a paroled individual without warrant or cause. However, in permitting this particular suspicionless search, the Court merely identified, in its own language, an additional "limited circumstance[]" in which a suspicionless search can survive Fourth Amendment review. In my view, the condition highlighted by the Court which gave rise to this additional limited circumstance is not present in the case before us.

In justifying its use of the totality of the circumstances test in a suspicionless search case, the Court wrote:

> Therefore, although this Court has only sanctioned suspicionless searches in limited circumstances, namely programmatic and special needs searches, we have never held that these

-2-

are the only limited circumstances in which searches absent individualized suspicion could be "reasonable" under the Fourth Amendment. In light of California's earnest concerns respecting recidivism, public safety, and reintegration of parolees into productive society, and because the object of the Fourth Amendment is reasonableness, our decision today is far from remarkable.

Samson, 126 S. Ct. at 2201 n.4. In others words, as I read this passage, the Supreme Court has now identified three limited circumstances in which a suspicionless search will survive Fourth Amendment review: (1) programmatic searches; (2) special needs searches; and (3) searches conducted as part of a state's conditional release program. This last category is limited by the Court's language to a state search program that is genuinely designed to improve the monitoring and reintegration of conditional releasees.

In my view, the DNA extraction and cataloguing program mandated by the DNA Act does not fit within this third limited category. As the majority makes clear, the plain language of the Act and its legislative history show that the purpose of the DNA Act is future crime-solving. Nothing more. It is not part of an earnest effort on the part of the state to monitor and reintegrate conditional releasees into society.

Because the Act does not satisfy the limited circumstance that validated the search in Samson, in order to survive Fourth Amendment review as a suspicionless search it must constitute

-3-

either a programmatic search (which no party has contended) or a special needs search.[14]  I agree with the majority that because "law enforcement objectives are central to the DNA Act . . . the analysis applicable to special needs 'beyond the normal need for law enforcement' is inapplicable here."  Ante at 21 (citation omitted).  Therefore, I would hold the suspicionless search at issue here unconstitutional under the Fourth Amendment, as it does not meet the criteria of any of the three limited circumstances for constitutional suspicionless searches that have been identified by the Supreme Court.

Having made this narrow legal point, I am also compelled to raise my grave concern that the majority's totality of the circumstances analysis represents a further unfortunate step in the continuing erosion of the Fourth Amendment's vital protections.  By assigning so little weight to the privacy invasion posed by placement of one's unique DNA in a national database, and such overwhelming weight to the state's interest in future crime solving, the majority unfortunately lays the groundwork for the expansion of such analysis beyond the category of prisoners,

---

[14]As I read Samson, the Supreme Court has left open the possibility that other types of suspicionless searches might also survive Fourth Amendment review under the totality of the circumstances test.  I see no reason to conclude that the DNA Act comprises a fourth exception to the general requirement of individualized suspicion.  In addition, in order to protect the integrity of the Fourth Amendment, I would leave it to the Supreme Court to identify additional exceptions to the general rule.

-4-

parolees, probationers, and those on conditional release, to include ordinary citizens who, because of their employment, activity, or position in society, also could be said to have a reduced expectation of privacy.

I recognize that the majority leaves for another day the question of the right to retain the DNA profile in the CODIS database following the conclusion of appellee's supervised release period. However, other circuits have already decided this question and found such a limitation unnecessary. See, e.g., United States v. Sczubelek, 402 F.3d 175, 184-85 (3rd Cir. 2005) (analogizing permanent retention of DNA profiles to permanent retention of fingerprints and photographs); cf. United States v. Kincade, 379 F.3d 813, 875 (9th Cir. 2004) (Kozinski, J., dissenting) ("As a practical matter . . . the chance that Kincade could have his DNA removed from the CODIS database once he completes his supervised release is about the same as the chance that someone arrested and fingerprinted, but eventually found innocent, could force the FBI to delete his fingerprints from its database, namely nil.").

It was said by Edmund Burke, "The true danger is when liberty is nibbled away, for expedients, and by parts." I cannot, in good conscience, sign on to a decision that I believe provides the legal rationale for an enormous expansion of state intrusion into the most private of realms, without warrant, probable cause, or even suspicion.

-5-

Therefore, I respectfully dissent.